## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          CRIM. NO.  02-030043-MAP

    Plaintiff,

vs.

IVAN TELEGUZ,

    Defendant.                December 6, 2004


### MOTION TO SUPPRESS EYEWITNESS TESTIMONY
### (WITH REQUEST FOR HEARING)


NOW COMES the defendant, IVAN TELEGUZ, by and through by and through his attorney, DAVID J. WENC, and hereby moves this Honorable Court for the entry of an Order suppressing from introduction and use at trial, certain eyewitness identifications of defendant TELEGUZ, and any evidence derived therefrom, AND AS GROUNDS THEREFOR, states as follows:


*1. Basic Principles of Eyewitness Identification and Memory Applicable to the Challenged Identifications Demonstrate the Unreliability of the Challenged Identifications of IVAN TELEGUZ.*

#### a.  Human Memory

Reliable eyewitness identification depends on human memory. When an individual experiences an important event, it is not simply recorded in memory like videotape. This generally accepted theory was set forth in detail by Psychologist Ulric Niesser in 1967. When an individual experiences an event, she

acquires fragments of information from the environment. She integrates all this information with (1) prior expectations, (2) information previously stored in memory and (3) information acquired after the event occurs. The result of this amalgamation is her memory of the event. Sometimes the memory is accurate and sometimes it is inaccurate.

Psychologists study memory by using a variety of techniques. One of the most common is to try and identify circumstances under which memory is inaccurate versus circumstances under which memory is accurate. Memory tends to be inaccurate under four general circumstances: (1) poor environmental conditions; (2) circumstances affecting the ability of the witness to perform mental functioning; (3) circumstances occurring after the event, such as long retention interval or erroneous information that happens to be learned and once learned, gets incorporated into the memory; and (4) errors introduced at the time of retrieval, for example, biased tests or leading questions.

Most theoretical analyses divide the memory process into three stages. Elizabeth Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal 11* (2d. Ed. 1992).

The first stage is the individual's perception of the event, and the entry of the information into the memory system. This is the acquisition stage. Next, some time elapses before

the witness tries to remember the event. This is the retention stage. Last, the witness tries to recall the stored information, which is called the retrieval stage. Psychologists who conduct research in the area of memory attempt to identify and study the important factors in the three stages. *Id.*, Loftus & Doyle, at 11; Cohen, Peter J., M.D., J.D., *How Shall They Be Known? Daubert v. Merrell Dow Pharmaceuticals and Eyewitness Identification*, 16 Pace Law Review 237, 242 fn. 40, (Winter 1996).

There are two categories of factors that affect the acquisition stage: event factors and witness factors. Event factors include such things as lighting conditions, duration of the event, speed and distance involved, and the presence or absence of violence.

Witness factors include stress, fear (such as "weapon focus"), chronic stress (recent negative life occurrences can trigger memory deficits), expectations, age and gender. *Id.*, Cohen, at 243. *In the instant case, discovery supplied to date has not indicated the circumstances under which Michael Quickel saw TELEGUZ. Without an evidentiary hearing, there is no way a determination can be made regarding how the the event and witness factors affected the acquisition stage of Quickel.*

Like the acquisition stage, the retention stage of memory is also influenced by two sets of factors: the length of the

retention interval, and post-event information. The retention interval is the period of time that elapses between acquisition of the information and its retrieval. Post-event exposure refers to the interaction between information originally acquired, and additional input gained at a subsequent point in time. After an event is over, memory fades. New information to which one is exposed can influence the accuracy of the prior memory.

"For example, a witness to a traffic accident may later read a newspaper article which stated that the driver had been drinking before the accident. 'Post event information can not only enhance existing memories but also change a witness's [sic] memory and can even cause non-existent details to become incorporated into a previously acquired memory.' When witnesses later learn new information which conflicts with the original input, many will compromise between what they saw and what they were told later on." *Id.*, Cohen, at 246-247.

Simple common sense leads one to believe that the longer the interval between the time a person experiences something and when she tries to remember it, the poorer will be the memory. What is not such a matter of common sense, however, is that the longer the retention interval, the more vulnerable the memory is to "post-event contamination" or "post-event information."

Post-event information refers to information that is learned after an event takes place that is then integrated into

the memory of the event. Loftus & Doyle, *Eyewitness Testimony*, *supra*, at 35, 54-56. After integration takes place, it generally is not possible to disentangle information, which came from the event itself, and information, which was learned and became integrated later on. To the degree that the post-event information is false, this would cause the ultimate memory to become more inaccurate.

Examples of post-event information include leading questions, overhearing other witnesses talking about or having conversation with other witnesses, reading about the event in the newspapers, and other similar occurrences.

*In the instant case, Michael Quickel identified "Ivan" from a photo array on September 18, 2003, approximately 11 months after the alleged firearms conspiracy ended.*

### b. Interviewing Techniques

False identifications result from certain interviewing techniques used by police to retrieve information.

External and internal factors also influence retrieval of information: how a witness is interviewed or questioned may create bias, even if unintended. This principle, that people are influenced by the expectations of other people, is exemplified

in the Experimenter Expectancy Effect: the interviewer's unintentional transmission of information to her subjects, whereby the interviewer can make the subject respond with the desired outcome. *Identifying Ivan*, Wagenaar, W.A., Harvard University Press, 1988. The only way to prevent the interviewer from affecting the outcome of the interview is for the interviewer not to be aware of the desired outcome. This is known as a "blind" testing procedure.

In virtually every other form of scientific testing, blind testing is so essential that scientific experiments are commonly rejected for publication if the interviewer knew the desired outcome. Failure to keep the interviewer blind as to the results is also grounds for peer rejection of the results of the study. Nettles, Nettles & Wells, *Eyewitness Identification: I Noticed You Paused On Number Three*, The Champion, November, 1996, Vol. XX, No. 9, pp. 10, 11-12.

In a similar vein, controlled studies demonstrate that it is essential for the interviewer to admonish the witness that the suspect may or may not be in the lineup or photo array. This relates to another principle: people often do not realize they are being influenced. Failure to provide this warning reinforces the witnesses' natural tendency to assume that the suspect is in the lineup and it is their job to figure out which one she is. Id., Nettles, Nettles & Wells, at 12. The investigator's

failure to advise the witness that the suspect might not be in the array or lineup produces a lineup that is suggestive and unreliable. Recommendations for Properly Conducted Lineup Identification Task, G.L. Wells, E. Seelau, S. Rydell, & C.A.E. Luus in *Adult Eyewitness Testimony: Current Trends and Developments*, D.F. Ross, J.D. Read, & M.P. Toglia (eds.), Cambridge University Press, 223-244 (1994).

A third principal relates to what is referred to as "the confidence malleability effect." This effect occurs when the interviewer, by some word or act, reinforces the decision made by the witness, boosting their confidence in their identification choice. This confidence is later intuited by the jurors, who (often incorrectly) determine that the witness' confidence equates with accuracy. Studies have demonstrated that mock jurors rely heavily on witness confidence when making decisions about whether to believe the witness, but are not able to differentiate accurate from inaccurate statements. Wells, Lindsay, & Ferguson, *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identifications*, Journal of Applied Psychology, 64, 440-448 (1979).

Law enforcement agents can easily inflate the confidence of a witness by telling them they picked the person suspected of the crime. This impermissibly taints the witness' memory. The witness becomes more confidant, and the jury places more

confidence in the choice of the witness. But the jury's confidence is misplaced: it is not based upon the witness' own memory but on the police procedure that influenced the memory. Once tainted, the testimony of the witness in not admissible. United States v. Wade, 388 U.S. 218 (1966).

*In the instant case, the FBI 302s fail to describe the conversations, which took place between law enforcement agents, and Michael Quickel before, during and after the viewing of the photo arrays of "Ivan". Therefore, an evidentiary hearing is called for in order to make a record of the interviewing techniques used here.*

### c. Photo-Biased Identification

Research shows that viewing photographs prior to making identification can taint the identification and lead to false identification.

Photo exposure makes a face look familiar and witnesses will often, at a later identification, experience that familiarity and mistakenly relate it back to some original event rather than back to the intervening photo exposure. It is not possible to separate out which event the witness is identifying— that which first occurred or the later viewing of the photo.

"Uncommon Transference" can occur, whereby a person seen in one situation is confused with or recalled as a person seen in another situation. When observations of photo arrays or lineups are involved, significant problems with reliability can arise: biased instructions to the witness can affect the identification as set forth in the preceding paragraphs; irrational factors such as discrimination, prejudice or myth may impermissibly taint a witness' identification. Cohen, *supra* at 248-250.

For example, studies show that difficulties often arise if a person views a lineup containing people whom previously appeared in mug shots. In fact, several studies show that persons appearing in identification tests who also appeared in prior photos may be at greater risk for false identification, and may even be identified at a rate similar to the rate at which the actual culprit is identified. Cutler, Brian & Penrod, Steven, Mistaken Identification, Cambridge University Press, 1995.

Publicity about a case or person can also be a form of post-event information resulting in a photo-biased identification. The same difficulties arising from the mugs hot example above would occur if a photo spread were exhibited depicting a person whose photographic or video image was previously viewed on television.

This process of false identification based upon prior exposure to photographic images is called "photo-biased identification" and creates a serious question as to whether the photo-identification test can be considered meaningful. If it can be shown that individuals who were unconnected to the crime but who were exposed to similar media coverage can pick out the photo of the person depicted in the media, then the photo-identification test can be considered biased.

*In the instant case, the government failed to determine whether the photo spread shown by federal agents to possible identification witnesses was biased due to prior exposure to mug shots or other photos. Individuals, who were exposed to prior mug shots or other photos of TELEGUZ, could pick out his photo from the photo spread constructed by the government agents here. To the extent that actual witnesses connected to this case were similarly exposed to prior mug shots or other photos, it is highly likely that the face of IVAN TELEGUZ would be familiar and that photo-biased familiarity could be a basis for selection of the face from the photo spread.*

    **2. *Prevailing Legal Authority Supports the Exclusion of the Challenged Identifications of Ivan Teleguz***

        **a. Legal Test for Admissibility of <u>Eyewitness Identification Evidence</u>**

"Reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The Supreme Court in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), listed the factors to be considered in determining the reliability of a pre-trial identification. These criteria include: the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Id.*, at 199.

When the constitutionality of a photo array or similar pre-trial identification procedure is challenged, the due process clause requires the court to conduct a two-step inquiry. The court must first determine whether the photo array or procedure was impermissibly suggestive. If so, the court proceeds to determine whether the identifications were nevertheless reliable under a "totality of the circumstances" analysis. United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994).

In considering the suggestiveness of a photo array, for example, the court considers the size of the array, its manner of presentation by officers and the details of the photos themselves. *Id.*, at 1262.

A defendant's right to due process includes his "..Right not to be victimized by suggestive police identification procedures, including suggestive displays of photographs, that creates "a very substantial likelihood of irreparable misidentification."" United States v. Rosa, 11 F.3d 315, 330 (2nd Cir. 1993); Simmons v. United States, 390 U.S. 377, 384 (1968); Manson v. Brathwaite, *supra*, at 105 n.8; Neil v. Biggers, *supra*, at 198.

*Defendant Teleguz contends that the photographic arrays and photo spreads exhibited by the government in this case to various witnesses to determine if they could identify Mr. Teleguz are in themselves unduly suggestive. The photo array consisted of 7 males. All of the males, with the exception of the males depicted at positions ##2 and 7, were clean-shaven. Only the male @ position #2 wore a turtleneck sweater.  Only the male @ position #2 possessed eyes that were deep-set and darkened.  The males @ positions ##1 and 4 sported buzz-cuts as opposed to longer hairstyles.*

**REQUEST FOR HEARING**

**A.   Request for Evidentiary Hearing**

Defendant requests the Court to schedule an Evidentiary Hearing on this Motion to Suppress Eyewitness Identification.

As is evident from the matters presented above, the government intends to call several persons to identify Ivan Teleguz. All of these individuals have previously identified Ivan Teleguz from photographs and/or composite drawings.

Notwithstanding the discovery received from the government to date, the defense is clearly without sufficient factual information to fully present its arguments to the court. Short of a hearing at which the witnesses can be examined, there is no way for defendant to obtain the information necessary to demonstrate the validity of his position to the Court.

For example, the reports provided to the defense by the government concerning the identifications of Mr. Teleguz do not contain the detail necessary to make a complete determination as to reliability.

In order to demonstrate to the court that the pretrial identifications of Mr. Teleguz are unreliable, the defense is in need of far greater information concerning (1) the extent of each witness' exposure to Mr. Teleguz's image, (2) the circumstances surrounding their identification of him, including words exchanged between them and the agents and any other

persons present, (3) interactions the witnesses may have had with other witnesses or individuals, and information overheard or exchanged between them, since the time of the event they witnessed, (4) the degree of certainty of each witness as to their identification of Mr. Teleguz, (5) the degree of stress any witness was under at the time of their observation or identification of Mr. Teleguz.

A review of the summaries of each identification witness provided above demonstrates the presence of a myriad of indicators of unreliability.

Clearly, an evidentiary hearing at which the defense can question these individuals concerning their identification of Mr. Teleguz, their memory of events, their exposure to publicity and his image, and the identification procedures used with each of them is crucial to a determination of this motion.

WHEREFORE, the defendant prays that this motion be granted.

                          RESPECTFULLY SUBMITTED,
                          DEFENDANT, IVAN TELEGUZ,


                          By: _____
                              David J. Wenc, His Attorney
                              WENC LAW OFFICES
                              44 Main Street
                              P.O. Box 306
                              Windsor Locks, CT 06096
                              860-623-1195
                              BBO #549400

**CERTIFICATION**

    I hereby certify that on December 6, 2004 I served copy of the foregoing Motion by U.S. mail, first-class postage prepaid, to:

Assistant U.S. Attorney Kevin O'Regan
Federal Building & Courthouse
1550 Main Street
Springfield, MA  01103

                                                _____
                                                David J. Wenc, Esq.