```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2                      WESTERN SECTION

 3

 4      UNITED STATES         *      Docket No. 02-30043
                              *
 5      VS.                   *      Springfield, MA
                              *
 6      IVAN TELEGUZ          *      November 29, 2005

 7      *    *    *    *    *        10:07 a.m.

 8

 9

10           TRANSCRIPT OF THE HEARING HELD BEFORE
               THE HONORABLE MICHAEL A. PONSOR,
11           UNITED STATES DISTRICT COURT JUDGE.

12

13

14

15     APPEARANCES:
       For the Plaintiff:  KEVIN O'REGAN, Assistant
16         U.S. Attorney, 1550 Main Street, Springfield,
           Massachusetts 01103, representing the
17         Government.

18     For the Defendant:  Law Offices of David J. Wenc,
           44 Main Street, Windsor Locks, Connecticut 06096,
19         representing the Defendant, Ivan Teleguz.
           BY:  DAVID J. WENC, ESQUIRE
20

21

22

23

24

25                     Sarah L. Mubarek
                 Registered Professional Reporter
```

*Exhibit A.* [handwritten]

```
 1                    (Court came in at 10:07 a.m.)
 2                    THE COURT:  Please be seated.
 3                    THE CLERK:  This is the case of United
 4      States vs. Ivan Teleguz, criminal action 02-30043.
 5                    THE COURT:  Well, let me tell you what
 6      we've been trying to do with regard to the
 7      interpreter.  It has turned out to be a tremendous
 8      problem.
 9          Mr. Wenc, I was looking at your report to the
10      court, November 14th:  "The defendant Teleguz
11      requires the services of a Russian speaking
12      interpreter."  That was six weeks ago.  If you had
13      said Ukrainian, we could have organized it.  I don't
14      think it's asking too much for an attorney to be able
15      to know his client well enough to inform me
16      accurately of what sort of translator is needed.  I'd
17      like an apology, Mr. Wenc, and an explanation for how
18      this happened.
19          The closest Ukrainian interpreter we have is in
20      Chicago.  That's the closest certified Ukrainian
21      interpreter we've been able to find.  That's the one
22      they use in Rhode Island.  We can't set that up in a
23      day or two.  I want an explanation and I want an
24      apology.
25                    MR. WENC:  Well, number one, I've
```

```
1    located one in New York City and I can share that
2    information with Ms. French later.
3                THE COURT:  When is he available?
4                MR. WENC:  I haven't spoken to the
5    gentleman.
6                THE COURT:  Well, okay, that's step
7    one is to -- yes, they exist.  They exist in New
8    York.  There's one in Buffalo.  There's one in Albany
9    that we've attempted to call who is not willing to
10   make the drive.  Yeah, they exist.  Try and get them
11   here.
12               MR. WENC:  Well, I think my
13   explanation is similar to the explanation I gave
14   yesterday.  If you go through all of these
15   transcripts, all the discovery that the government
16   has presented me from day one, every identification
17   of any foreign language spoken was Russian, not
18   Ukrainian.
19               THE COURT:  Did you show your client
20   this pleading?
21               MR. WENC:  I probably sent it to him.
22   He was probably in Virginia.
23               THE COURT:  And he looked at it and
24   never responded by saying, "I need a Ukrainian
25   interpreter, not a Russian interpreter"?
```

```
 1                MR. WENC:  Communication from me in
 2   Windsor Locks, Connecticut down to Virginia was
 3   extremely difficult in terms of him calling me.  I
 4   think he might have called me once or twice when he
 5   was there.
 6                THE COURT:  Can he write letters?
 7                MR. WENC:  Maybe he can, but there was
 8   no response with respect to that.  You know, the
 9   explanation I gave yesterday still stands.  That is,
10   I was under the impression that we were dealing with
11   a Russian group.
12                THE COURT:  Did you ever say to your
13   client, "What sort of interpreter would you need?"
14                MR. WENC:  No, I didn't.
15                THE COURT:  All right.
16                MR. WENC:  No, I didn't.  I made an
17   assumption that we were dealing with a Russian --
18                THE COURT:  Right, but you never asked
19   your client.
20                MR. WENC:  That's correct.
21                THE COURT:  All right. We've got a
22   problem.  You're just going to have to wait and be
23   ready to go whenever we can get the interpreter.  I
24   don't know when that will be, but you can wait, and I
25   will tell you when we have the interpreter.
```

1         I'll be very happy to hear the name of the
2    gentleman that you know down in New York City.  We
3    will attempt to contact him, and we'll see if we can
4    find somebody on one or two day's notice who is
5    willing to give us ten days of his or her time to
6    come up here and translate for this trial.
7         You know, you have put me in a box.  I still
8    haven't heard an I'm sorry, by the way.  I haven't
9    heard you apologize or say I made a mistake or I
10   should have done something different.  Fine, you
11   don't want to say that.  I'll just park it in the
12   back of my mind.  We'll know that that's the sort of
13   relationship that we have.
14        We will attempt to find somebody and we will try
15   to get somebody up here as soon as possible.  Until
16   then, you be ready, and we will let you know at three
17   o'clock every day whether we will be going forward
18   the next day.  We'll continue to call these people
19   and we will continue to try to get somebody here.
20        You have put me in a box.  You have stated on
21   the record that your client needs a Ukrainian
22   interpreter.  I have no choice.  I must find that
23   interpreter, otherwise we might as well not even try
24   this case because if he says he needs that
25   interpreter, he's got to have that interpreter.  We

1   will do whatever we can to try and find the
2   interpreter and make sure that he has those services
3   while he's here, because if we go forward with this
4   trial and he doesn't have a proper interpreter, we
5   will be trying this case again in another year or a
6   year and a half, and I don't want to do that.
7           But this is not a fair way to treat the Court.
8   It is not competent for you to not at least ask your
9   client what kind of interpreter he needs.  To say
10  yesterday, and I have to say in a rather breezy
11  fashion, "Oh, by the way, I've just learned that my
12  client needs a Ukrainian interpreter.  We're ready to
13  go tomorrow morning, and you and your staff, you get
14  to work and find a Ukrainian interpreter for me on
15  less than 24 hours notice who can come here and
16  commit ten days or two weeks to coming into this case
17  and be competent to translate a federal court felony
18  trial."  That's the notice that we got.  So okay,
19  that's the way that you want to treat me.  I'll just
20  keep that in mind.
21              MR. WENC:  Well, you know, your Honor,
22  I indicated yesterday that, and I'll indicate today,
23  you know, perhaps it's due to my lack of
24  sophistication in foreign languages, but in my mind I
25  had no difference between Ukrainian and Russian.

1      Perhaps I'm still living in the old Cold War era
2      where I never made that distinction.  When I talked
3      about Russia it was the Soviet Union, and everything
4      was lumped together.  That's how I was brought up.
5                      THE COURT:   All right.
6                      MR. WENC:  But I'm a little upset as
7      well.  I think it appears to me that you for some
8      reason have taken it out on me solely, and I'm having
9      a hard time accepting that blame from the Court,
10     okay?  Now, you know, we all sort of work together
11     here, and I'm not trying to pull any fast ones or
12     whatever.
13         I, in retrospect -- I mean, this thing kept me
14     up all night.  I couldn't sleep because of the words
15     you had for me yesterday.  I was very upset over it.
16     Not in a mad way, but I was just upset because I come
17     to this Court on a regular basis and, you know, I
18     don't want to jeopardize whatever relationship I have
19     with the Court, so I was upset about that.
20                     THE COURT:  I think you should be
21     upset.  This is a catastrophe.  You should be upset.
22     This is not something that's supposed to be
23     happening.  I respect the fact that you're upset.  If
24     you weren't upset, I'd be really astonished.  This is
25     a major problem.

1    This is a 2002 case. This particular gentleman
2    was indicted in 2004. I set this up for a status
3    conference on November 14th. You said I don't have
4    to be at the status conference, everything is okay,
5    we're ready to go to trial. That's your report to
6    the Court. Please excuse me from coming to the
7    status conference, I don't need to be there. You
8    didn't appear. You gave me the report. I relied on
9    the report. That's what happened.
10   That's the last time you're not coming to a
11   status conference, I can tell you that. You know,
12   maybe we would have -- this topic would have come up
13   somehow, randomly, in some way, and we would have
14   been able to iron it out. But you didn't want to
15   come to the status conference. I gave you that
16   courtesy. You're very busy. I got this report
17   saying we're ready to go. We need a Russian speaking
18   interpreter. Just get my guy up here and I will be
19   ready to try my case.
20   The situation really gets worse and worse. It
21   couldn't be worse. As you know, your client is
22   facing a capital trial down in Virginia. I had to
23   issue an order to the marshals, ordering them to
24   bring him up here. They didn't want to bring him up
25   here. At one point they just simply told me we

1   couldn't get him up here.  It's a great deal of
2   trouble.  The security issues are very difficult with
3   the gentleman who's facing the death penalty in
4   Virginia.
5       The marshals have busted their rear ends to
6   arrange this.  At one point it was going to cost them
7   $15,000 to get a special flight for this gentleman.
8   Ms. French has been on the phone.  Mr. Stuckenbruck
9   has been on the phone trying to get things arranged,
10  and now if I had to bet, I would say we're probably
11  not going to be able to go forward with this trial.
12  I'm going to keep trying.  I'm not giving up on this
13  trial date.
14      That means the marshals have got to make
15  arrangements for this gentleman, who's a very high
16  security person, to either keep him here in this area
17  or fly him back down to Virginia and then bring him
18  back up here for whatever our continued trial date
19  is.  So I'm not surprised you stayed up last night.
20  This is a real mess that's been dumped in my lap.
21      You don't like to be blamed for it, but I
22  honestly don't see that it's unfair or unreasonable
23  of me to put the responsibility on you to know what
24  your client's native language is, or at least to
25  expect your client when he sees that you're asking

```
 1     for a Russian interpreter to say sometime before the
 2     day before trial, "Oh, I'm sorry, Mr. Wenc, Russian
 3     won't do."
 4          I'll tell you another couple of things. You put
 5     me in a position where he wants this interpreter, I'm
 6     going to give it to him, but the gentleman is quite
 7     good in English obviously. You've spoken to him in
 8     English. The Russian interpreters tell me all
 9     Ukrainians really understand Russian. He was
10     understanding Russian. So I have a little bit of
11     scepticism here about whether I'm being manipulated
12     by you or whether I'm being manipulated by him or
13     whether he really needs a Russian interpreter.
14          All right, you're shaking your head, oh, dear,
15     poor Judge Ponsor, but I think that is a legitimate
16     concern I have. I don't think he used an interpreter
17     for his arraignment. I think there was an
18     interpreter there and he proceeded in English. So
19     okay, let's make this trial as drawn out as we
20     possibly can. Let's make it as difficult as we
21     possibly can. It will go twice as long or at least
22     half again as long with a Ukrainian interpreter who
23     he may or may not need but which he's now demanding.
24          This is an apocalyptic mess, and yes, you are to
25     blame. You were the one arranging the interpreter.
```

1    You asked for it.  You're his attorney, it's your
2    responsibility.  Now, these things happen, okay.  But
3    it's a catastrophe.  It's the kind of catastrophe
4    that one deserves to spend a night up about.  You
5    should have done better.  That's my opinion.
6        Let's take care of the motions in limine, and
7    then we'll be ready for trial as soon as we can get a
8    Ukrainian interpreter here.  The position I'm going
9    to take is I will let you know by three o'clock every
10   day whether we're going to trial the next day, and
11   we'll just keep at it until we've got an interpreter
12   who we can find who's going to come from New York or
13   Chicago or Buffalo or Albany or somewhere and who has
14   got ten days to give us to try this case.
15       It's not going to be easy.  It's going to take a
16   lot of work from our clerk's office, and certainly
17   we're very happy to have any suggestions for names
18   addresses or telephone numbers of people who might be
19   in the business of doing this, and we will contact
20   those people and try to get them here as soon as
21   possible.  If you don't have anything else to say,
22   let's move on to the motions in limine.
23              MR. WENC:  Well, the only thing I have
24   to say is I'm not trying to manipulate the Court with
25   respect to this interpreter thing.  The issue hit me

1    in the face yesterday when I spoke to the
2    interpreters who said, "Oh, we don't speak
3    Ukrainian," and that's when the issue presented
4    itself.
5         Now, I know that the other gentlemen that pled
6    in front of you with the same interpreters, some of
7    them were Ukrainian.  Now, whether or not they
8    understood what was going on fully, I'm going to
9    leave that to them and their counsel, but when it
10   came to my attention, I just raised the issue for the
11   Court.
12              THE COURT:  Most Ukrainians understand
13   Russian.  That's what I'm told.  As a matter of fact,
14   I happen to be a little bit familiar with this
15   because I had a Ukrainian intern from Western New
16   England College School of Law.  He was born in the
17   Ukraine.  He's a Russian speaking Ukrainian.  In
18   fact, when Ukraine became independent and the country
19   began using Ukrainian as its national language, where
20   previously it would have been Russian, he had to do a
21   little bit of work to get himself up on Ukrainian.
22        The languages are quite similar, but they're
23   different in certain important ways, and many people
24   who are ethnically Ukrainian, who are nationally
25   Ukrainian, live within the boundaries of Ukraine,

1    speak Russian as their native language.  The fact
2    that somebody comes from Ukraine does not mean that
3    they aren't fluent in Russian.  Almost all
4    Ukrainians, as I understand it, are taught Russian
5    from an early age.  Many people speak Russian who
6    live within Ukraine and have Ukrainian names.
7         So the fact that somebody lived within the
8    boundaries of Ukraine does not mean that they don't
9    know Russian.  Many of them know Russian very, very
10   well.  I suspect, strongly suspect Mr. Teleguz knows
11   Russian very, very well.  But he says he wants a
12   Ukrainian interpreter, we'll get him a Ukrainian
13   interpreter.
14        Have you had any luck, Mr. Stuckenbruck?
15              THE CLERK:  No.  I did just receive a
16   phone call that maybe somebody's been found in Maine
17   who can do it, but the agency I'm going through has
18   not been able to reach her yet, so he doesn't know
19   for sure yet what her availability might be.
20              THE COURT:  Okay.  I've just informed
21   counsel that I'm going to let them know by three
22   o'clock every day as to whether or not we have an
23   interpreter who will be here the next day.
24        This is the most unpleasant conversation I've
25   had with counsel in open court in twenty years as a

1  judge.  As a magistrate judge, as a U.S. district
2  court judge, this is the most unpleasant fifteen
3  minutes I've spent in court in twenty years.  So if
4  there's nothing further, we'll move on to the motions
5  in limine and we will take care of the motions in
6  limine in and get ourselves in a position to be able
7  to jump out of the box just as soon as we have
8  somebody on board who can come here and handle the
9  translation for Mr. Teleguz.
10        Can you he will tell me, Mr. O'Regan, what kind
11  of progress you made yesterday?
12              MR. O'REGAN:  I think we've made
13  substantial progress.  If your Honor has the motion
14  there?
15              THE COURT:  Yes I, do.
16              MR. O'REGAN:  I can take you through
17  it pretty quickly and I think resolve most of the
18  issues.  We probably need you to resolve one thing
19  for us.
20              THE COURT:  All right.
21              MR. O'REGAN:  Prior convictions --
22              THE COURT:  Go ahead.  I'll locate it
23  here in just a second.
24              MR. O'REGAN:  Number one is prior
25  convictions.  There are no prior convictions for